934 F.2d 320
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellant,
v.
Robert BOWEN, Defendant-Appellee.
 No. 90-5823.
 United States Court of Appeals, Fourth Circuit.
 Argued Feb. 8, 1991.
Decided June 5, 1991.
 
 Appeal from the United States District Court for the Southern District of West Virginia, at Charleston. John T. Copenhaver, Jr., District Judge. (CR-89-174)
 Carol A. Casto, Assistant United States Attorney, Charleston, W.Va., for appellant.
 Henry Edward Wood, III, Charleston, W.Va., (Argued), for appellee; Michael W. Carey, United States Attorney, Charleston, W.Va., on brief.
 S.D.W.Va.
 VACATED AND REMANDED.
 Before DONALD RUSSELL and SPROUSE, Circuit Judges, and RICHARD L. WILLIAMS, United States District Judge for the Eastern District of Virginia, sitting by designation.
 PER CURIAM:
 
 
 1
 Pursuant to a plea agreement, defendant Robert Lee Bowen entered a plea of guilty in federal district court to one count of receiving child pornography. At sentencing, the court awarded defendant a two-level reduction in his base offense level for acceptance of responsibility. The government now appeals the sentence given, contending that Bowen's varied and ever-changing justifications for his actions made it error for the court to allow such reduction. Finding that the sentencing court did clearly err when it allowed Bowen the two-level reduction, we vacate the sentence and remand for resentencing.
 
 I.
 
 2
 In 1986, Robert Bowen, owner and sole proprietor of "Bob's Used Refrigerators," a.k.a. "Bob's Used Appliances," of Nitro, West Virginia, purchased a used freezer from Loretta Sharp. Subsequent to this transaction, Bowen began making occasional social visits to the Sharp home, where Sharp lived with her two minor daughters, then ages ten and twelve. At some point, a sexual relationship, involving "sexual fondling," developed between Bowen and Sharp.
 
 
 3
 Around Christmas of 1986, Bowen visited Sharp and found her depressed over money problems, especially her inability to purchase Christmas gifts for her children. In response to this situation, Bowen mentioned that he would be willing to pay Sharp $3,000 for nude photographs of her daughters. Bowen expressed a preference for taking the photographs himself, but, in the alternative, he stated that he could supply a camera and film to Sharp so that she could take the pictures. These photographs would supposedly be sold to a man in New York for inclusion in a "kiddieporn" magazine. Only partially believing Bowen's story, Sharp declined to participate in any such plan.
 
 
 4
 Nearly two years later, Bowen again approached Sharp about taking nude photographs of her daughters, now ages twelve and fourteen. This time, Bowen also made inquiries about the girls' physical development, specifically asking about the size of their breasts and the existence and color of their pubic hair. Sharp told a neighbor about this conversation, and the neighbor in turn contacted the West Virginia Department of Public Safety ("the State Police"). The State Police initiated an investigation, and Sharp agreed to provide assistance. Thereafter, the State Police had her place a series of monitored phone calls to Bowen which were recorded.
 
 
 5
 The first recorded conversation occurred on September 9, 1988. After initial pleasantries, Sharp told Bowen that she was desperate for money and thus was considering his earlier proposal. Bowen appeared interested in obtaining nude photographs of the Sharp girls, although he mentioned that he probably could not market them to the man in New York. Defendant again expressed an interest in taking the pictures himself, and he stated that he would most likely pay Sharp either fifty dollars, if she took the pictures by herself, or one hundred dollars, if he was allowed to help. Bowen also suggested that in order to take the pictures of the girls, Sharp should procure some "heavy sleeping pills or something" that would "knock 'em out."
 
 
 6
 On September 19, 1988, there was a second recorded phone conversation between Bowen and Sharp, during which Sharp agreed to take the pictures of her girls. Bowen agreed to send Sharp money for film and flashcubes, and he also gave her pointers on how to take the pictures. This time, Bowen suggested that the girls be gotten drunk so that they would pass out. He requested poses "from the front, the back and everything. OK? ... Close up shots.... Good shots, OK?" Specifically, Bowen instructed:
 
 
 7
 Well, take them laying there, you know, I want, I want a good front view of them, the hair and everything, you know what I mean? ... And the breast, and everything like that. You know what I mean? ... And then you can turn them over on their, on their back and get a rear shot and everything like that.... Try to spread their legs and things like that, you know.
 
 
 8
 On September 20, 1988, Bowen mailed Sharp a twenty dollar bill to defray the costs of the film and flashcubes. Thereafter, on September 27, a third phone conversation occurred. This time, Sharp told Bowen that she had taken the requested photographs; she supposedly had thrown a "little party" where her daughters had gotten drunk on wine coolers. Bowen instructed Sharp to mail the pictures by registered mail, and he gave her his full name and mailing address for this purpose. Sharp, though, mentioned that she might send only one picture, with the rest forthcoming once payment was made. During this conversation, Sharp also first mentioned a fifteen (later said to be fourteen) year old friend of her daughters who came from a "messed up home" and might be willing to pose for Bowen. Defendant appeared interested in this news, although his main concern was getting Sharp to mail the pictures she had supposedly taken of her daughters.
 
 
 9
 Later that same day, a sexually explicit photograph of a female minor was mailed by registered mail to Bowen's post office box. This photograph had been confiscated in a previous child pornography investigation, and postal inspectors cut off the girl's face in the picture so that Bowen would not recognize that it was not of one of Sharp's children. Bowen signed for and received the picture on September 29, and thereafter he mailed Sharp $50 in cash.
 
 
 10
 A fourth recorded telephone conversation occurred on October 4, 1988. In this, Bowen acknowledged receipt of the first photograph, and there was much discussion about the fictitious friend of the Sharp children. Sharp mentioned that this girl needed money to leave home and that she would be willing to pose for Bowen. Sharp then stated that she had anticipated that Bowen would want to see what the girl looked like, and thus had already taken a roll of film and a polaroid of her in the nude. Bowen, though, appeared apprehensive that the girl might tell others about the nude posing, thus getting Sharp and him "in deep trouble.... That can give you 25 years in jail. You know what I mean?" Bowen suggested that Sharp "cool it" for three to four weeks, and after this a photography session might be arranged. Sharp, though, told him that she had already mailed him the sample photographs.
 
 
 11
 On October 5, 1988, Bowen received, again by registered mail, the package containing the roll of undeveloped film and the polaroid, both supposedly of the young friend. Later in the day, Sharp called Bowen for the final time, to arrange a time and place for them to meet so that she could give him the other pictures of her children. During this conversation, Bowen mentioned that he had received the photographs of the friend, but that these were not worth anything because the girl's face had been either blacked out or not photographed. Sharp and Bowen then agreed to meet at 5:30 p.m. that day in front of the St. Albans, West Virginia, Post Office.
 
 
 12
 For this meeting, Sharp was fitted with a recording device and was monitored closely by state and federal officials. At the appointed time, Sharp entered into Bowen's pick-up truck, which was parked outside the post office, and she and Bowen proceeded to have a long conversation. Sharp did not deliver any of the pictures that she had supposedly taken of her daughters, but instead gave Bowen six photographs that were said to be of the fictitious friend. After this, much of the conversation centered around this friend. Bowen appeared upset that the face of the girl in the pictures had been blacked out, and he requested that Sharp give him a picture that included the girl's face:
 
 
 13
 With the face blocked out, I can't even show them to anybody. It it don't do no good, you know.
 
 
 14
 Well, see I just don't know what she looks like, I mean all the faces are blacked out.... Most of the people, if you, if you get rid of photographs and everything, got to have the face with the body, you know what I mean.
 
 
 15
 I would like to have one good picture with a face on it, so, I, you know, in case I I I could, you know.... It's just like a, it's just like a portfolio though. You go to, you go to a modeling agency, you got to have the whole thing, you know, the face and everything, cause that's what they're buying, you know what I mean? And and if you show somebody, say hey, I can give you a layout, a photograph with this here on it, but it don't have no face on it, ain't ain't nobody going going to say well, yeah I'll take it you know. At least one, where the, you know, where where you got a face, you know what I mean? ... Cause if I had one with a face, I could say well, you know, here.... These, these are all blanked out, but this is the face that comes with the body, you know.
 
 
 16
 During this conversation, Bowen again appeared frightened that the fictitious friend might tell someone about being photographed. For the second time, he told Sharp to "cool it" for several weeks while she got to know the girl better; this time, he also mentioned that Sharp should not say or do anything further until the girl herself brought up the subject. Bowen, though, for the first time, expressed an interest in not only photographing the girl, but also in having sex with her. He also mentioned that he could line up some friends for this purpose.
 
 
 17
 Bowen: That girl be interested in going to bed with anybody?
 
 
 18
 Sharp: I don't know. I'd have to talk to her about it.
 
 
 19
 Bowen: Make more money doing that then she can the other way.
 
 
 20
 Sharp: Yeah.
 
 
 21
 Bowen: Huh.
 
 
 22
 Sharp: I guess so, I don't know. Who did you have in mind?
 
 
 23
 Bowen: Me.
 
 
 24
 Sharp: You?
 
 
 25
 Bowen: To start with.
 
 
 26
 Sharp: Well.
 
 
 27
 Bowen: And yeah, teach her a few things and everything, you know, I know, I know a lot of people.
 
 
 28
 Sharp: Yeah.
 
 
 29
 Bowen: You know, I mean that only thing is that's a two hour drive up there though.
 
 
 30
 Sharp: Well, I'm I'm supposed to be getting a car, if I have a gas man.
 
 
 31
 Bowen: Yeah, you could bring her down like, you know, huh a weekend or something like that, you know, I could have a few people lined up.
 
 
 32
 When the conversation ended, Sharp left the truck and shortly thereafter Bowen was arrested by the State Police. In the search incident to this arrest, an envelope containing six sexually explicit photographs of a minor were found in Bowen's shirt pocket, and defendant laconically stated, "I didn't take them."
 
 II.
 
 33
 Bowen was initially arrested pursuant to a state warrant, but this warrant was later dismissed because of a defect in its drafting. Some time thereafter, Bowen learned through his then counsel, Michael R. Cline, that both state and federal officials intended proceeding against him for violations of their respective child pornography laws. After learning this, Bowen, through his attorney, entered into plea negotiations, and on October 19, 1989, he executed a joint plea agreement with the United States and the State of West Virginia. Defendant agreed to plead guilty in United States District Court to a one-count information charging him with violating 18 U.S.C. Sec. 2252(a)(2), by knowingly receiving through the mail a visual depiction of a minor engaging in sexually explicit conduct. Bowen also agreed to plead guilty in West Virginia state court to a state count alleging possession of such material.
 
 
 34
 On October 19, 1989, Bowen pleaded guilty in the United States District Court for the Southern District of West Virginia to one count of violating 18 U.S.C. Sec. 2252(a)(2). The court accepted the plea and set the matter for sentencing. On November 15, 1989, Bowen was interviewed by the United States Probation Officer preparing his presentence report. According to the presentence report:
 
 
 35
 When interviewed ..., Mr. Bowen minimized his involvement in the instant offense expressing that he was pushed or talked into buying nude photographs and that his motivation ranged between a desire to help Loretta Sharp, who was in dire need of money, and a desire to conduct his own investigation of Ms. Sharp's unfitness as a mother. Mr. Bowen suggests that it was his intention to turn [the] photographs received from Ms. Sharp over to the police so that she could be prosecuted.
 
 
 36
 The probation officer also noted that when interviewed, Bowen "indicated that he had no sexual interest in underage girls." Finding that Bowen's comments were clearly contradicted by the evidence, the report noted that defendant was "apparently not willing at this time to fully admit the wrongfulness of his behavior." Because of this, the probation officer recommended that Bowen not be awarded a two-level reduction in his base offense level for acceptance of responsibility. The report also suggested that pursuant to Sentencing Guideline Sec. 2G2.2(b)(2), defendant's base level be increased by five levels because of Bowen's intent to distribute the photographs received from Sharp.
 
 
 37
 After receiving the presentence report, on December 12, 1989, defendant filed a motion to relieve Michael Cline as his attorney. The court heard this motion on January 5, 1990, and granted Bowen's request. Thereafter, Henry Wood became Bowen's attorney, and on January 23, 1990, he filed with the court Bowen's objections to the presentence report. Defendant objected to both the suggested five-level increase for intent to distribute and the suggested denial of the two-level reduction for acceptance of responsibility.
 
 
 38
 Sentencing was scheduled for January 31, 1990, and two and one-quarter hours before the hearing was to begin Bowen advised Wood that he wished to withdraw his guilty plea. A motion to withdraw the plea was quickly prepared and filed, and the court held a hearing on this motion during the time originally scheduled for the sentencing. Bowen based his motion on the fact that he had been misled by his original counsel concerning the possible five-level increase for intent to distribute; defendant maintained that during the plea negotiations he agreed to plead guilty only to receiving, not distributing, the material, and he had no idea that a charge of distribution could, in any way, be invoked against him. Over the government's objections, the district court allowed Bowen to withdraw his guilty plea.
 
 
 39
 A day after the plea was withdrawn, a federal grand jury sitting in the Southern District of West Virginia returned a twocount indictment against Bowen, charging him with violations of 18 U.S.C. Sec. 2252(a)(2). Defendant was arraigned on February 8, 1990, and he entered a plea of not guilty. Trial was scheduled for April 9, 1990, and extensive discovery was had. On March 27, Bowen requested a continuance and, over the government's objection, the court rescheduled the trial for April 23, 1990. Later, the court on its own motion again continued the trial, until May 14, 1990.
 
 
 40
 On May 14, just prior to the start of trial, Bowen entered into another plea agreement with the government. This agreement was similar to the one previous, defendant again agreeing to plead guilty to one count of violating 18 U.S.C. Sec. 2252(a)(2). Such a plea was entered and accepted the next day, May 15, and sentencing was scheduled for June 12, 1990.
 
 
 41
 On May 24, 1990, Bowen was reinterviewed by the same probation officer with whom he had previously talked. During this conversation, Bowen continued to deny that he intended to distribute the pictures. Defendant, though, did, for the first time, admit that the photographs were for his own sexual gratification. The probation officer found Bowen to be more candid during this conversation, but in the presentence report he again suggested not awarding the two-level reduction for acceptance of responsibility: "This writer ... continues to believe that [defendant] falls short of acceptance of responsibility. Timeliness is one of the criteria to be considered in determining if a defendant has accepted responsibility. Mr. Bowen has reluctantly admitted his participation in the instant offense." Also, the probation officer again suggested increasing Bowen's base offense level by five levels because of his intent to distribute the photographs.
 
 
 42
 Bowen objected to the presentence report, and at sentencing on June 12 he was allowed to testify and expand upon his written objections. At this time, in a rambling, disjointed account, defendant offered a fourth rationale why he wanted the photographs. Supposedly, Sharp had been pestering Bowen for money and causing him marital problems, and defendant wanted the pictures, with the faces intact, so that he would have a "hold on her." Specifically, Bowen stated:
 
 
 43
 Well, Your Honor, as far as the issue she's talking about, you know, only half of the case has been presented. The other half, my half has never been told ever, except for when I told [the probation officer]. They are just--they're just looking at one side of the case. That's what it is. That's--that's basically what it is. Like I said, when I testify if I do get to testify, I'll explain everything, why--why I wanted the faces on there, you know, because it was--it was no good to me the way it was there because she already called my wife one time and different things. So, you know, there is a reason why I wanted a face on there because basically what it is, I wanted to get something on her because she'd already called my wife one time and told her that I was out doing things and stuff like that. It just so happened that night, the night she called and talked to my wife, I was at the--I was picking up her father that night and I was suppose to have a date with her and everything. I come home and my wife is all upset and everything like that.
 
 
 44
 You know, she--called me wanting to pay phone bills and different bills for her and things like that. It just--basically from the start, it just--it just mostly got out of hand. That's exactly what happened.
 
 
 45
 I was never, ever going to distribute anything. Even when she asked me on the tapes, I told her I was going to keep them for myself. And I was keeping them for myself, to have a hold on her. I know that's not right to do something like that. I know I did wrong. I absolutely agree. But I just needed--you know, once in the first telephone conversation, she called me at home, okay, wanting to--she tried to get me to say that I wanted to buy tapes or buy pictures or whatever she was talking about. And finally she brought it around. Well, after that conversation, I did talk to her and I--and I talked to her about photographs, but I knew she was moving. I knew she was moving. I was done with her.
 
 
 46
 All I did is pass by her a little bit. I told her she didn't want to do that. I hung up the phone. I didn't run over to her house. I didn't go over to her place and say hey, here's some money for photographs, I want the photographs and everything. I didn't do that. I never bothered her no more. And then here she is, she's calling me long-distance. She's like a leech. How am I suppose to get rid of her? I've got to do something. She is going to call my wife again.
 
 
 47
 After hearing the testimony of Bowen and the arguments of counsel, the court determined not to give defendant the five-level increase for intent to distribute. The sentencing judge then recessed for twenty minutes, during which time he pondered whether to give the two-level reduction for acceptance of responsibility. Upon returning to the bench, the court announced specific, detailed findings regarding this issue. Acknowledging that Bowen had just taken the stand and given a new excuse in attempting to justify his conduct, the court nevertheless awarded the two-level reduction; the court classified the new excuse as a "secondary" or "subsidiary" reason for Bowen's conduct, and found that on the whole--because of the guilty plea and the admission to the probation officer during the second interview--Bowen had accepted responsibility. The court found:
 
 
 48
 With respect to acceptance of responsibility, the court finds that although the defendant pled guilty to the original offense charged in the case, the defendant at that time was not acknowledging the misconduct except by the guilty plea, for the defendant was continuing to insist that there were reasons that prompted his action which, in fact, seem to have no basis. Those appear in the probation officer's report. The defendant was permitted to withdraw his plea of guilty. He was charged anew and has since pled guilty to one of the two counts in the indictment that followed.
 
 
 49
 With respect to the plea agreement regarding the indictment that followed, it appears to the court that the defendant did undertake to accept responsibility by acknowledging that his involvement in this misconduct was due to his quest for his own sexual gratification. The court was satisfied, based on that which was before it, upon commencing this sentencing hearing today, that it would be appropriate, under all the circumstances, to permit the defendant the two point credit for acceptance of responsibility.
 
 
 50
 As Mr. Bowen has done, however, so often in this case, he seems intent on self-destruction. His statement to the court today, just as Ms. Casto noted, has cast a cloud over his entitlement to the acceptance of responsibility credit. The defendant does today indicate, once again, that there was some other reason for his conduct than that of sexual gratification. Now it appears to be that the defendant had some motive to retaliate against Ms. Sharp because of some conduct on her part which the defendant asserts constituted an unwarranted intervention on her part in his family life.
 
 
 51
 As a consequence in determining the question of the availability of acceptance of responsibility for the defendant, it seems to the court that the defendant, on the one hand, has pled guilty and, in addition to that, has at least in connection with the second charge filed against him in the form of the indictment, indicated to the probation officer that the reason for his misconduct was that of his own sexual gratification, and I add that it appears to the court that is exactly the reason that the defendant engaged in his misconduct.
 
 
 52
 On the other hand, the defendant indicates that a subsidiary reason, a secondary reason, as it were was retaliation with regard to Ms. Sharp. The court has concluded to treat the latter as a secondary, rather than primary, and even though I recognize it as being an unwarranted attempt to apologize, perhaps because some family of Mr. Bowen is present, for his misconduct, or at least to excuse it by his own self-serving declaration, the court on balance has concluded that it will grant the acceptance of responsibility credit to Mr. Bowen and accordingly, fixes his offense level at 11, which brings about a sentence of 8 to 14 months as being the guideline range for custody purposes.
 
 
 53
 The government now appeals the two-level reduction for acceptance of responsibility.
 
 III.
 
 54
 Section 3E1.1(a) of the federal Sentencing Guidelines provides that, "If the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct, reduce the offense level by 2 levels." We have held that "[w]hether to apply Guideline Sec. 3E1.1 is clearly a factual issue and thus [is] reviewable [upon appeal] under a clearly erroneous standard." United States v. White, 875 F.2d 427, 431 (4th Cir.1989). "[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Anderson v. Bessemer City, 470 U.S. 564, 573 (1989) (citation omitted). After reviewing the facts of this case, we are left with the definite and firm conviction that the sentencing court did err when it allowed defendant the twolevel reduction for acceptance of responsibility.
 
 
 55
 Application Note 1 to Section 3E1.1 is a nonexclusive list of seven appropriate objective considerations for a sentencing court to rely upon when determining whether a defendant has accepted responsibility. Of these, we find four to be apposite here:
 
 
 56
 (a) voluntary termination or withdrawal from criminal conduct or associations; ...
 
 
 57
 (c) voluntary and truthful admission to authorities of involvement in the offense and related conduct;
 
 
 58
 (d) voluntary surrender to authorities promptly after commission of the offense; ... and
 
 
 59
 (g) the timeliness of the defendant's conduct in manifesting the acceptance of responsibility.
 
 
 60
 U.S.S.G. Sec. 3E1.1, comment. (n. 1).
 
 
 61
 Bowen did not voluntarily terminate his activities of trying to procure sexually explicit photographs of minors, nor did he voluntarily surrender himself to the authorities. As for timeliness, defendant's only conduct which could reasonably be said to manifest acceptance of responsibility, the admission that the photographs were for his own sexual gratification, came rather late in the proceedings, and, as is shown below, this admission was later implicitly denied. We find, however, that here, as in most cases, the most important consideration to be taken into account is (c), whether the defendant has made a "voluntary and truthful admission to [the] authorities of [his] involvement in the offense and related conduct."
 
 
 62
 Over the course of this case, Bowen has alleged at least four different reasons why he attempted to procure from Sharp sexually explicit pictures of underage females. First, during his initial conversation with the probation officer, defendant alleged that he was motivated by a desire to help Sharp out of her dire financial situation. In the course of this same conversation, Bowen also explained that his conduct was for the purpose of conducting his own investigation of Sharp's fitness as a mother, and that he intended to turn the pictures over to the authorities eventually so that Sharp could be prosecuted.
 
 
 63
 Bowen's third justification, given during his second interview with the probation officer, was that the pictures were for his own sexual gratification. Undoubtedly this statement, given when defendant was well aware of the value, under the guidelines, of accepting responsibility, was the most truthful made by Bowen over the course of these proceedings. Despite the fact that the statement was made over seven months after his initial plea and that it does not explain why defendant wanted the faces on the pictures left intact, had this statement been Bowen's last, we would not have found an acceptance of responsibility reduction here clearly erroneous.
 
 
 64
 Unfortunately, Bowen became his own worst enemy when, at sentencing, he offered a fourth justification for his actions. Defendant, this time, stated that he wanted the pictures, with the faces intact, so that he would "have a hold" on Sharp. Supposedly Sharp had called Bowen's wife and told her about some of his extramarital activities, and Sharp had also badgered Bowen trying to get him to pay some of her bills. The recorded telephone conversations, though, do not substantiate Bowen's claims. Far from wanting to get rid of Sharp, Bowen appeared pleased to hear from her and disappointed that she had moved out of the area. While Bowen told the court, "I was done with her.... I didn't run over to her house," in fact, he stated to Sharp on the phone that "I was just up your place. Ain't nobody there." As for Bowen's assertion that Sharp had told his wife about some of his activities, the recorded conversations also show this to be untrue.
 
 
 65
 The sentencing court clearly recognized Bowen's fourth and final justification as "an unwarranted attempt to apologize, ... or at least to excuse [his actions] by his own self-serving declaration...." The court, nevertheless, treated defendant's incourt justification as a "subsidiary" or "secondary" reason, and awarded the two-level reduction because of Bowen's earlier "sexual gratification" comment to the probation officer. We find this to be clear error. Bowen in his statement to the lower court did not mention that the pictures were for his own sexual gratification, nor did he classify his latest reason as one secondary to another. Instead, he made it clear that his reason for acquiring the pictures was "to have a hold on her." By manufacturing this last excuse, we find that Bowen was implicitly denying his earlier justifications, including that the pictures were for his own sexual gratification. Defendant's statement to the court was definitely not truthful, and it also calls into question the voluntary nature of the earlier sexual gratification confession.
 
 
 66
 After reviewing the entire evidence, we are left with the definite and firm conviction that a mistake was committed when the sentencing court found that Bowen had clearly demonstrated a recognition and affirmative responsibility for his criminal conduct. We thus vacate the sentence, and remand the case to the district court for resentencing.
 
 
 67
 VACATED AND REMANDED.